UNITED STATES of America, Appellee,

v.

Colin Brooks ANDERSON, a/k/a Colin Taylor, Appellant.

UNITED STATES of America, Appellee,

v.

Kathryn ANDERSON, a/k/a Kathy A. Alfonsi, and Kathy's Kranes and Construction Co., Inc., Appellants.

UNITED STATES of America, Appellee,

v.

Larry Vincent NURRE, Appellant.

UNITED STATES of America, Appellee,

v.

Richard Carl LUNDIN, Appellant.

UNITED STATES of America, Appellee,

v.

LUNDIN CONSTRUCTION CO., INC., a/k/a Lundin Construction, Appellant.

UNITED STATES of America, Appellee,

v.

Donald Richard SHOWALTER, Appellant.

Nos. 88–5134 to 88–5137, 88–5139 and 88–5188.

United States Court of Appeals, Eighth Circuit.

Submitted March 17, 1989.

Decided July 13, 1989.

Rehearing Denied in No. 88–5134 Aug. 11, 1989.

Rehearing Denied in No. 88–5135 Aug. 14, 1989.

Rehearing Denied in No. 88–5136 Aug. 10, 1989.

Rehearing Denied in No. 88–5188 Aug. 24, 1989.

Rehearing and Rehearing En Banc Denied in No. 88–5137 Aug. 30, 1989.

Paul Engh, Louis Smith and William Mauzy, Minneapolis, Minn., for appellants.

Elizabeth de la Vega, for appellee.

Before WOLLMAN and MAGILL, Circuit Judges, and LARSON,* Senior District Judge.

WOLLMAN, Circuit Judge.

The defendants, Colin Brooks Anderson, Kathryn Anderson, Larry Vincent Nurre, Richard Carl Lundin, Lundin Construction

* The HONORABLE EARL R. LARSON, United States Senior District Judge for the District of Minnesota, sitting by designation.

Co., Inc., and Donald Richard Showalter, appeal their convictions of knowingly and willfully making false statements to the United States Government, in violation of 18 U.S.C. § 1001, and conspiring to defraud the United States, in violation of 18 U.S.C. § 371. We affirm the judgments of the district court.[1]

Section 8(a) of the Small Business Act authorizes the Small Business Administration (SBA) to enter into contracts with the federal government and then to subcontract them out, or "match" them, to small businesses. 15 U.S.C. § 637. Beginning in 1969, several Presidents issued Executive Orders directing federal aid for minority business enterprises. Since then, section 8(a) has been utilized to assist socially and economically disadvantaged persons or businesses participate in the free enterprise system. To become certified for the 8(a) program, a business must establish that it is socially or economically disadvantaged, is owned by a minority person and not a mere front for a non–8(a) business, is actually controlled by a minority person, and will be performing at least 15 percent of the government contract. Involvement in the 8(a) program is advantageous because contracts are awarded to minority businesses without competition and at rates higher than those awarded to non–8(a) businesses.

In January 1980, Kathryn Anderson, owner and president of Kathy's Kranes Corp., contacted Donald Showalter, a minority business specialist for the SBA, to inquire about the 8(a) program. Anderson applied for certification for the program based on her minority status as a woman, a Native American, and a physically handicapped person. The SBA ultimately granted Anderson 8(a) certification on June 26, 1981.

Prior to certification, Kathy's Kranes had completed a few small construction jobs and an $80,000 paving job. In November 1981, however, Anderson indicated to Showalter that she believed Kathy's Kranes could do the Winona Reach E–2 Flood Control Project, which had an estimated value of $750,000. She claimed that Kathy's Kranes had a bonding capacity of $1.5 million. This, however, was not true.

To perform a job the size of the Winona project, Anderson needed to find a contractor that could provide her with the required bonding capacity and other financial assistance. Anderson had disclosed this to the SBA in her initial application for certification: "We are currently negotiating with a large dirt contractor in the southern part of Minnesota to 'big brother' our corporation relative to favored status equipment rates, partial bonding and job joint ventures." The SBA had earlier instituted a sponsorship program for established businesses, but this program had been abused and eliminated before Anderson entered the 8(a) program.

In late November 1981 Anderson was introduced to Richard Lundin, a nonminority businessman, and on January 8, 1982, Anderson, Lundin, Kathy's Kranes, and Lundin Construction Co., Inc. entered into a management agreement. The management agreement provided that (1) Lundin Construction would immediately provide Kathy's Kranes with a full-time management employee; (2) Lundin Construction would act as Kathy's Kranes' primary and exclusive subcontractor; (3) the parties would originate a joint checking account that required signatures by both parties for the disbursement and receipt of all payments; (4) Lundin Construction would receive 60 percent and Kathy's Kranes would receive 40 percent of the profits earned for jobs on which Lundin Construction worked; (5) on all other jobs, Lundin would receive 25 percent of net quarterly profits earned by Kathy's Kranes; (6) Lundin Construction would advance $50,000 working capital, furnish bonds for contracts ranging from $1,000,000 to $5,000,000, and establish a working line of credit of $200,000; (7) Lundin and Lundin Construction would have access to Kathy's Kranes' books and records; (8) Kathy's Kranes would immedi-

1. The Honorable Harry H. MacLaughlin, United States District Judge for the District of Minnesota.

ately issue to Lundin 19 percent of Kathy's Kranes' outstanding stock upon payment by Lundin; and (9) the parties agreed to modify the agreement if the District Counsel for the SBA found that it did not comply with SBA rules and regulations.

Although the agreement required approval by the SBA District Counsel, Anderson instructed her attorney to send the agreement to Showalter. Even though the agreement violated several SBA rules, Showalter took no action and did not submit the agreement to the District Counsel for approval. In fact, Showalter, without authorization, informed the bond agent that the agreement "in no way" impeded Kathy's Kranes' status as a socially and economically disadvantaged contractor in the 8(a) program. A week after Anderson entered the management agreement, she submitted a Revised Business Plan to Showalter. Although Anderson was requested to "describe any tie-in arrangements with general contractors or subcontractors or other trade affiliations," the submitted plan contained no reference to Lundin or Lundin Construction.

In April 1982, Kathy's Kranes began to negotiate with the Army Corps of Engineers, which was in charge of the Winona project. At the negotiations, Larry Nurre, chief operations manager for Lundin Construction, was introduced as a representative of Kathy's Kranes. Lundin hired Bob Park as general manager for Kathy's Kranes. Although Nurre and Park both prepared the Winona project proposal, the proposal said that it had been prepared by someone working solely for Kathy's Kranes.

In late April, Colonel John Atkinson began to question Kathy's Kranes' financial ability to do the project. Showalter attempted to reassure Atkinson, but Atkinson was unpersuaded. On May 3, 1982, Atkinson notified the SBA that he was withdrawing the project from Kathy's Kranes, unless more financial assurances were provided.

On May 24, 1982, Lundin sent Atkinson the following letter:

This letter is to insure you that I will not in any manner be assuming the majority ownership or the control, or the management of Kathy's Kranes & Construction Corporation.

I have agreed to and will invest $50,000 into Kathy's Kranes and Construction Corporation, as capital cash insertion for stock representing 19 percent ownership of the firm. * * *

As a separate action, I have guaranteed re-payment of funds provided to Kathy's Kranes Corp. for a $200,000 line of credit from the Northwestern National Bank of Mankato, Minnesota, particularly for the Corp[s] of Engineers project, Winona Reach E2. * * * *My guarantee does not give me or my firm any ownership, management, or control interest's [sic] in those rights, whatsoever.* It is highly unlikely that I will ever have to provide funds under this guarantee.

*In summary my sole involvement with Kathy's Krane[s] and Construction Corporation will be limited to that of a minority shareholder, specifically a shareholder having 19 percent ownership.* [emphasis added]

After receiving this letter, Atkinson phoned Lundin and asked why Lundin was making the investment. Lundin said that he felt compelled to "offer an opportunity for somebody else" in the business. Notwithstanding these statements to Atkinson, Lundin had told his banker, bonding agent, and accountant, as well as Community Initiatives Consortium, which agreed to extend a loan to Kathy's Kranes, that Lundin Construction would be doing the Winona project.

Atkinson authorized final negotiations to be held June 3, 1982. Nurre again acted as negotiator for Kathy's Kranes. On June 21, 1982, Anderson signed a $727,000 contract for the Winona project. One of the clauses in the contract provided that "the Contractor hereby agrees not to further subcontract any of the performance of this contract not already provided for in his [sic] proposal at the time of acceptance without prior written consent of the SBA contracting officer." The Kathy's Kranes'

proposal did not include a subcontract with Lundin Construction.

Kathy's Kranes hired Nurre to head the Winona project, but he remained on the Lundin Construction payroll. The major equipment for the job was rented from Lundin Construction, and supplies were obtained through it. The payroll was processed at Lundin Construction's offices and was then flown to Minneapolis for Anderson to sign. The Winona job payments were assigned to a joint checking account, the signators on which were Nurre, Lundin, and Anderson. Anderson herself rarely visited the Winona job site.

In May of 1982, the SBA began investigating Lundin's involvement with Kathy's Kranes. An auditor for the Defense Contract Audit Agency had discovered that Anderson had copied over a footnote in the financial statement she had given him. The note explained that she had agreed to a 19 percent stock transfer to Lundin for $50,000 and a line of credit. The auditor confronted Showalter and Anderson. Showalter admitted that he had advised Anderson to omit the footnote. When asked if the stock transfer agreement was in writing, Showalter and Anderson said that it was not. Later, Lundin and Anderson produced the written management agreement, but wrote the SBA that the management agreement "has never been in force and is null and void." Anderson wrote that "no moneys had been exchanged," and "nothing in the agreement took place." Anderson and Lundin claimed at trial that they based their statements on the facts that Anderson had never issued the stock to Lundin and the agreement had never been approved by the SBA.

Despite Showalter's knowledge of the Kathy's Kranes investigation, on August 13, 1982, he matched Kathy's Kranes to the Air Force Hangar Repair Project. Lundin guaranteed the bond for the project and Nurre negotiated as a Kathy's Kranes employee. The Air Force contract contained a provision similar to that in the Winona contract that required Kathy's Kranes to obtain written consent from the SBA for any subcontracting. The contract made no mention of any intention to subcontract.

The notice to proceed on the Air Force project was issued November 29, 1982, and on that same day, Anderson signed a 100 percent subcontract for the work with Bob Park, who had left Kathy's Kranes and returned to his own company, Paragon Constructors. All the work was supervised by Paragon and was performed by Paragon employees with Paragon equipment. Kathy's Kranes issued paychecks to the Paragon employees, and then Paragon reimbursed Kathy's Kranes.

The Air Force became suspicious that Kathy's Kranes had subcontracted the entire project. Therefore, on February 25, 1983, the contracting officer for the project sent a letter to Kathy's Kranes asking if it had in fact done so. Colin Anderson, Kathryn Anderson's son and then comptroller of Kathy's Kranes, denied that the entire contract had been subcontracted:

> The following employee's [sic] W–2 forms are enclosed. * * * These forms should show without a shadow of a doubt that these are KKC employee's. [sic] Our work was not subcontracted to another contractor. We hired Paragon as a material supplier—(they are the Thermal–Chem epoxy glue company in our area) and consultant/advisor in the placing of epoxy materials.

In early 1983, Kathy's Kranes began negotiating a third project that had been matched by Showalter, a $1.5 million Veteran's Administration project. Lundin guaranteed the bond for the project and a $200,000 line of credit. Nurre again negotiated as a Kathy's Kranes employee and substantially prepared the project estimate. Lundin Construction supplied most of the equipment and some of the workers were Lundin Construction employees who were placed on Kathy's Kranes' payroll. Proceeds from the project were assigned to a joint checking account, which required a signature from a Lundin representative. Colin Anderson had told the bank and Lundin had told the bonding company that Lundin Construction was the primary subcontractor. Lundin Construction, however,

had never been mentioned in contract negotiations. The only reference to Lundin was to a nonexistent "Lundin Rental Company" that Kathy's Kranes said might rent equipment for the project. Like the previous two contracts, the Veteran's Administration contract provided that Kathy's Kranes would not subcontract without the approval of the SBA.

The final job at issue here for which Kathy's Kranes was matched was the Chequamegon National Forest project. The contract did not recognize any subcontracting by Kathy's Kranes and provided that SBA approval of any subcontractors was required. Anderson requested Leonard Bruyette to prepare an estimate for a 100 percent subcontract. She told Bruyette that the equipment should be rented, all. Bruyette's employees should be placed on Kathy's Kranes' payroll, and all materials should be ordered under Kathy's Kranes' name. Colin Anderson, Nurre, and Bruyette attended the preconstruction conference, where they presented Bruyette as Kathy's Kranes' project foreman.

By the spring of 1984, negotiations between Colin Anderson and Bruyette had fallen through and Kathy's Kranes had defaulted on the National Forest project. Kathy's Kranes had also defaulted on the Veteran's Administration project.

On September 11, 1987, a United States Grand Jury returned an eighteen count indictment against Showalter, Anderson, Kathy's Kranes, Park, Paragon Constructors, Lundin, Lundin Construction, Nurre, Colin Anderson, and Frank Johnston, the vice-president of Kathy's Kranes. Count I alleged that all of the defendants conspired to defraud the United States by "impeding, impairing, obstructing and defeating the administration of the 8(a) program in accordance with its stated purpose." The alleged object of the conspiracy was to "obtain the benefit of negotiated, noncompetitively bid contracts between Kathy's Kranes and the United States' agencies under the '8(a) program' by submitting proposals and executing contracts which failed to fully disclose the participation of noncertified 8(a) contractors." Counts II–VIII

and Count XV charged various defendants with making false statements to the government. The remaining counts were ultimately dismissed.

The district court joined all of the defendants for trial. After nine weeks of proceedings, the jury returned guilty verdicts on all of the counts, except that it acquitted Colin Anderson of one false statement charge and Park and Paragon Constructors of the conspiracy charge. Although the jury found Johnston guilty of conspiracy, the district court granted judgment of acquittal. The convicted defendants appeal.

## I. Severance of Defendants

Each of the defendants contends that the district court erred by denying severance of the defendants pursuant to Fed.R.Crim.P. 14, which provides that a court may grant a severance of defendants if it appears that a defendant is prejudiced by a joinder. Defendants primarily claim that they were prejudiced because (1) the jury found them guilty by association, and (2) the jury could not compartmentalize the evidence as it related to the separate defendants, *see United States v. Reed,* 658 F.2d 624, 629 (8th Cir.1981), *cert. denied,* 455 U.S. 1002, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982).

"It is the general rule that persons charged in a conspiracy should be tried together, particularly where proof of the charges against the defendants is based upon the same evidence and acts." *United States v. Jackson,* 549 F.2d 517, 523 (8th Cir.), *cert. denied* 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977), *quoted in United States v. De Luna,* 763 F.2d 897, 919 (8th Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985).

At trial, some of the evidence was admissible as to one or more defendants, but not as to the others. In addition, some of the evidence brought against one or more of the defendants was more damaging than the evidence brought against the others. This, however, does not require separate trials. *See Reed,* 658 F.2d at 629. With regard to the ability of the jury to compartmentalize, we find it strong evidence that

the jury acquitted Park and Paragon Constructors of the conspiracy count and acquitted Colin Anderson of one count of knowingly making false statements to the government. *See id.* at 630. Given this evidence, the jury's conviction of Frank Johnston, which the court later overturned, does not demonstrate the clear prejudice needed for reversal.

## II. Sufficiency of Evidence

■ All of the defendants challenge the sufficiency of evidence for their convictions for conspiracy to defraud the government. The heart of their contention is that Showalter acted alone in defrauding the government and that the other defendants merely relied on his counsel as an SBA representative. Defendants therefore claim that they did not join in an agreement or intend to defraud the government. Nurre and Colin Anderson also claim that they played insignificant roles in the events at issue and therefore were not parties to any agreement.

A conspiracy under 18 U.S.C. § 371 consists of an agreement to defraud the United States along with an act by one or more of the conspirators to affect the object of the conspiracy. The agreement "may consist of nothing more than tacit understanding." "The existence of the agreement may be shown by circumstantial evidence, including the conduct of the conspirators and any attending circumstances, particularly circumstances indicating that the defendants 'acted in concert to achieve a common goal.'"
*United States v. Campbell,* 848 F.2d 846, 851 (8th Cir.1988) (citations omitted).

Viewing the evidence in the light most favorable to the government, we find that there was sufficient evidence to convict the defendants of conspiracy to defraud the government. Although there is not evidence of an explicit agreement, there is evidence that each defendant, through various acts, concealed from the government the involvement of non–8(a) contractors in the 8(a) contracts awarded to Kathy's Kranes. Showalter was not alone in this concealment. All of the defendants may not have had knowledge of every detail of the conspiracy, but they all contributed to the same essential purpose. This is all that is required. *See United States v. Pintar,* 630 F.2d 1270, 1274 (8th Cir.1980).

Anderson, Lundin, Lundin Construction, and Colin Anderson also challenge the sufficiency of the evidence for their convictions of knowingly making false statements to the government. Count IX alleged that on October 13, 1982, Anderson and Lundin "submitted a letter [to the SBA] which stated that: 'This letter is to establish complete clarity of the attached agreement that has never been in force and is null and void with my firm and Lundin Construction.' When in truth, the Defendants well knew that the terms and conditions of the agreement were in force and effect commencing January 14, 1982.".

■ Lundin contends that he actually believed that the management agreement between himself and Anderson was null and void and that he brought adequate evidence to show that his belief was reasonable. He then refers to *United States v. Anderson,* 579 F.2d 455, 460 (8th Cir.), *cert. denied,* 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978), which states that "the government must negative any reasonable interpretation that would make the defendant's statement factually correct." Because Lundin believes that the government did not negate his interpretation of the agreement, he concludes that insufficient evidence was brought to convict him.

■ Lundin's reliance on *Anderson* is misplaced. In *Anderson,* the alleged false statement contained facial ambiguities. The court, therefore, required the government to "negative any reasonable interpretation" of the allegedly false clause. *Id.* Here, Lundin alleges that his and Anderson's agreement was open to interpretation and that the government was required to negate his reasonable interpretation. The government, however, is not required to negative all of Lundin's interpretations. The government is required to negative only any reasonable interpretation of an ambiguous statement. The statements at issue here—"never been in force"

and "null and void"—have accepted meanings. It was the jury's role then to determine whether Lundin made these unambiguous statements with the required knowledge that they were false. There was sufficient evidence from which the jury could find that Lundin knew his statements were false.

■ Anderson contends that there was insufficient evidence to support the finding that she knowingly made false statements because the evidence "strongly suggests" that she relied in good faith on Showalter's advice. The defense of good faith reliance on expert advice, which is used most frequently in tax evasion cases, is designed to refute the allegation that the defendant intended to commit the offense. *United States v. Johnson*, 730 F.2d 683, 686 (11th Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 186, 83 L.Ed.2d 119 (1984). To succeed with this defense, Anderson must show that (1) she fully disclosed all relevant facts to Showalter and (2) that she relied in good faith on his expert advice. *Id.* Anderson, however, fails to show either element of the defense. She presents only indirect evidence that she generally relied on Showalter. She does not present any evidence that she consulted Showalter concerning the agreement, that he advised her that it was void, or that she relied on his advice. In addition, it does not appear that contract interpretation was within Showalter's expertise.

Anderson also raises the defense of good faith reliance on expert advice with regard to her four other convictions of knowingly making false statements to the government. Here again, however, Anderson fails to meet her burden of proof by alleging only general reliance on Showalter. Thus, there was sufficient evidence to support the jury's findings that Anderson had knowingly made all five false statements to the government.

■ Colin Anderson also alleges a defense of good faith reliance on Showalter's advice. Although there is evidence that could possibly support Colin Anderson's allegation that Showalter helped him write a letter containing one of the false statements, there is no evidence that Colin Anderson relied in good faith upon this advice. In fact, there is strong evidence that Colin Anderson knew that the Air Force project had been subcontracted to Paragon when he wrote the Air Force that "[o]ur work was not subcontracted to another contractor." Colin Anderson's concealment of Paragon's involvement demonstrates a knowledge of falsity with regard to both of the false statements he made to the government.

Colin Anderson also raises *United States v. Anderson*, alleging that the government failed to clarify ambiguous language in the Air Force contract which prohibited further subcontracting without SBA approval. As discussed above, however, the government is required to negative only "any reasonable interpretation that would make the defendant's statement factually correct." *Id.* 579 F.2d at 460. The language in question here, however, was unambiguous and therefore does not fall within the strictures of *Anderson*.

### III. Evidentiary Challenges

■ Several of the defendants allege that they were prejudiced by evidence admitted by the district court. Lundin and Nurre object to the admission of their August 7, 1984, confessions to state antitrust charges of territorial allocations of public contracts, in violation of Minn.Stat. § 325D.53 subd. 1(1)(c).[2] The district court admitted the confessions, which had been given under oath, as prior bad acts evidence under Fed.R.Evid. 404(b). It then instructed the jury that "[t]his evidence may be considered by you solely for the purpose of determining Defendant Lun-

2. Lundin and Nurre contend that the government agreed not to introduce into evidence the transcript of their state antitrust guilty pleas. They, however, conceded at oral argument that the agreement was not on the record. All that the record shows is that several weeks after the alleged agreement, the defendants, the government, and the district court could not agree as to what the parties said in reference to the defendants' guilty pleas. We, of course, cannot address anything that is beyond the record.

din's and Defendant Nurre's intent, knowledge, or absence of mistake or accident in the alleged conspiracy charged in this case to defraud the United States."

Evidence of prior bad acts is admissible if (1) the evidence is relevant to a material issue; (2) the prior bad acts are similar in kind and reasonably close in time to the crime charged; (3) there is sufficient evidence to support a finding by the jury that the defendant committed the prior acts; [3] and (4) the potential prejudice of the evidence does not substantially outweigh its probative value. *United States v. Mothershed*, 859 F.2d 585, 588 (8th Cir. 1988). In determining whether the prior bad acts evidence is admissible, we grant the district court broad discretion. *United States v. Norton*, 846 F.2d 521, 524 (8th Cir.1988). The court did not abuse that discretion here.

First, the prior bad acts evidence was relevant to the material issues of agreement and intent. The evidence showed that Nurre, as Estimator and General Operations Manager of Lundin Construction, had engaged in collusive and noncompetitive bidding for public road construction projects between August 1982 and June 1984; that Lundin was aware and approved of this bidding; and that Lundin himself had signed collusive and noncompetitive bids prior to August 9, 1982. Here, Nurre defended the conspiracy charge by alleging that he did not make an agreement with coconspirators and he did not have knowledge of an illegal objective. He contends that he played no significant role in the conspiracy, being merely an employee of Lundin Construction. The 404(b) evidence, however, tends to refute this. It demonstrates that Lundin and Nurre had knowledge of each other's activities and acted in accordance with each other's actions. *Cf. United States v. Gustafson*, 728 F.2d 1078, 1083 (8th Cir.) ("Evidence is relevant when it serves to rebut a defense that a person had justifiably relied upon subordinates to handle business matters."), *cert. denied,*

469 U.S. 979, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984).

Second, the prior bad acts and the activities at issue here are similar in kind. In both situations, Lundin and Nurre violated the law by attempting to gain contracts for public construction projects. Moreover, the prior bad acts and the acts at issue here occurred during the same time period. Finally, we do not find that the prejudice to Lundin and Nurre so outweighed the probative value of the 404(b) evidence to bar the evidence from admission.

Showalter and Anderson object to the district court allowing testimony concerning their close personal relationship. The government initially attempted to bring in this testimony during cross-examination of Nurre: "You know, Mr. Nurre, that Kathy Anderson and Don Showalter did not have a normal business relationship, didn't you?" The court, however, sustained the defendants' objections to the question. The next day, Showalter's attorney asked Nurre if Showalter's advice to him had "smelled bad." The court at this time ruled that Showalter's attorney had opened the door to Nurre's knowledge of the relationship. On recross-examination by the government, Nurre testified that Showalter and Anderson did not have a "normal business relationship." Showalter himself admitted that his relationship with Anderson was "unprofessional." The court gave a limiting instruction to the jury so that the other defendants would not be harmed by this testimony.

Showalter and Anderson do not challenge the relevancy of this evidence. They concede that associations among defendants are relevant to a conspiracy charge. Showalter and Anderson instead contend that the prejudicial effect of this evidence outweighed any probative value. *See* Fed. R.Evid. 403.

Evidence of such a relationship as existed between Showalter and Anderson will of course be prejudicial. But mere prejudice is not enough. There must be unfair preju-

---

**3.** The standard of proof at the time of trial was clear and convincing. *See Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 1499, 99

L.Ed.2d 771 (1988). The confessions satisfied this standard because they were made under oath during a guilty plea.

dice that outweighs the probative value of the evidence. Here, the evidence is highly probative. Showalter's and Anderson's involvement in the conspiracy was central to the indictment. The evidence of their relationship demonstrated motive, a reason why they conspired together. It tends to demonstrate why Showalter became so involved with Kathy's Kranes and why he risked his job with the SBA to aid Anderson. On balance, we do not find that the district court abused its discretion by allowing the testimony regarding Showalter and Anderson's relationship.

■ The final objection to evidence that was admitted is made by Showalter. He contends that the district court erred in admitting the SBA's standard operating procedures. We disagree.

A central issue at trial was Showalter's unauthorized approval of the management agreement between Lundin and Anderson. The agreement violated certain SBA procedures and the evidence demonstrated that Showalter was aware of the procedures. The procedures were admitted to show what Showalter knew and had notice of, and the jury was instructed that a violation of the procedures was not itself an illegal act. The procedures were appropriately admitted for this purpose. *See United States v. Head,* 641 F.2d 174, 181 (4th Cir.1981), *cert. denied,* 462 U.S. 1132, 103 S.Ct. 3113, 77 L.Ed.2d 1367 (1983).

## IV. Showalter's Symbolic Assertion of His Right to Silence

■ Showalter contends that counsel for Colin Anderson improperly commented on his prearrest assertion of his right to

remain silent, in violation of *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). *See United States v. Zielie,* 734 F.2d 1447, 1461 (11th Cir.1984) (comment on defendant's exercise of right to remain silent, whether made by prosecutor or counsel for codefendant impairs integrity of that right), *cert. denied,* 469 U.S. 1216, 105 S.Ct. 1192, 84 L.Ed.2d 338 (1985). During cross-examination of Showalter, the following exchange took place:

> Counsel: [Y]ou knew there was an investigation, didn't you, for the last three years, Mr. Showalter? You knew there was an investigation, didn't you?
>
> Showalter: I knew there was an ongoing investigation.
>
> Counsel: And during that time, from the time of the investigation until the time of the indictment, did you ever go in and tell the F.B.I. or anybody else—

Transcript at 5231. At this point, Showalter's counsel objected. The court sustained the objection and instructed the jury to disregard the counsel's statement.

■ We find no constitutional violation of Showalter's rights. The questioning involved here addressed Showalter's silence prior to indictment. Impeachment by use of a prearrest silence does not violate the fifth or fourteenth amendments.[4] *Jenkins v. Anderson,* 447 U.S. 231, 238, 240, 100 S.Ct. 2124, 2129, 2130, 65 L.Ed.2d 86 (1980).

## V. Jury Instructions

Lundin and Lundin Construction contend that errors in the district court's instructions on Counts I and IX require reversal of their convictions. They allege that the instruction on Count I was confusing and

---

**4.** We do not decide whether a comment on a defendant's right to remain silent that is made by a codefendant's counsel is a violation of the fifth amendment. We have held that a comment by a codefendant's counsel regarding a defendant's failure to testify violates the defendant's right to a fair trial. *Hayes v. United States,* 329 F.2d 209, 222 (8th Cir.), *cert. denied,* 377 U.S. 980, 84 S.Ct. 1883, 12 L.Ed.2d 748 (1964). However, we have not addressed and need not address now a codefendant's counsel's comment in terms of the fifth amendment. There is a split among the other circuits regarding the resolution of this issue. *Compare United*

*States v. Whitley,* 734 F.2d 1129, 1137 (6th Cir. 1984) (defendant's right to remain silent not impaired when comment on silence made by codefendant's counsel, not prosecutor), *with United States v. Patterson,* 819 F.2d 1495, 1506 (9th Cir.1987) (comment on defendant's failure to testify, whether by prosecutor, court, or codefendant improper); *Zielie,* 734 F.2d at 1461 (comment by prosecutor or codefendant improper); *United States v. Aguiar,* 610 F.2d 1296, 1302 (5th Cir.) (comment by prosecutor or codefendant improper), *cert. denied,* 449 U.S. 827, 101 S.Ct. 91, 66 L.Ed.2d 31 (1980).

misleading and the instruction on Count IX was confusing and misleading, amended the indictment, did not adquately present their theory of defense, and instructed the jury to disregard the testimony of several defense witnesses. We believe the defendants are mistaken in their evaluation of the instructions.

Four general principles govern our evaluation of the adequacy of jury instructions. First, the instructions must inform the jurors of the essential issues before them and of the permissible ways of resolving those issues. *United States v. Montgomery*, 819 F.2d 847, 851 (8th Cir.1987). Second, a party is entitled to an instruction on his theory of the case, provided the instruction is timely requested, supported by the evidence, and correctly states the law. *Id.* at 851–52. Third, the district court is afforded considerable discretion in choosing the form and language of jury instructions. *Id.* at 852. Fourth, the adequacy of jury instructions is determined by reviewing them as a whole, *United States v. Kouba*, 822 F.2d 768, 770 (8th Cir.1987), and in the context of the trial.

*United States v. Jerde*, 841 F.2d 818, 820 (8th Cir.1988).

A review of the instructions as a whole demonstrates that the above requirements were met. The instructions informed the jurors of the issues before them and summarized the government's and defendants' theories of the case. The court did not give the instruction that the defendants submitted, but the court is not required to do so. Although the instructions were rather lengthy, as might be expected in a case of this sort, they were not confusing or cumbersome, as defendants allege. After a thorough review of the instructions, we conclude that the district court did not abuse its discretion in giving the instructions on Counts I and IX.

The judgments are affirmed.