UNITED STATES of America, Plaintiff–Appellee,

v.

Jimmy D. SWINK, Jr., Defendant–Appellant.

UNITED STATES of America, Plaintiff–Appellant,

v.

Jimmy D. SWINK, Jr., Defendant–Appellee.

Nos. 93–1763, 93–1877.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 10, 1993.

Decided April 15, 1994.

Rehearing Denied June 28, 1994.

Samuel Perroni, Little Rock, AR, argued (Rita Looney, on the brief), for appellant.

Clarence D. Stripling, Asst. U.S. Atty., Little Rock, AR, argued (Jana K.B. Christian, Asst. U.S. Atty., on the brief), for appellee.

Before HANSEN, Circuit Judge, JOHN R. GIBSON * and FRIEDMAN **, Senior Circuit Judges.

FRIEDMAN, Senior Circuit Judge.

This is an appeal from convictions of (1) conspiracy to make materially false statements to the Securities and Exchange Commission (SEC) and (2) perjury committed during an SEC investigation. We reverse both convictions, holding that (1) the district court's refusal to permit the defendant to call an exculpatory witness was reversible error and (2) the evidence does not support the perjury conviction. The government's cross appeal challenging the sentence therefore is moot.

I.

A. This case grows out of the financial failure in December 1989 of Swink & Company, Inc., a securities brokerage firm in Little Rock, Arkansas, that dealt mainly in municipal bonds. Jim D. Swink, Sr. (Swink, Sr.) was the president and owner of the company. His son, the appellant, Jimmy D. Swink, Jr.

---

* The HONORABLE JOHN R. GIBSON was Circuit Judge of the United States Court of Appeals for the Eighth Circuit at the time this case was submitted, and took senior status on January 1, 1994, before the opinion was filed.

** DANIEL M. FRIEDMAN, Senior Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation.

(Swink, Jr.), was the head of municipal bond trading at the firm.

Count 1 of a 17 count indictment filed in the United States District Court for the Eastern District of Arkansas charged Swink, Jr., and Swink, Sr., with conspiring "to make materially false statements to the SEC" in violation of 18 U.S.C. § 1001 and 15 U.S.C. §§ 78q and 78ff. The count alleged that part of the conspiracy was that "the defendants and Bruce Reid would create documentation and records that represented that the bonds of the Industrial Development Authority of University City, Missouri, had been sold by Swink and Company, Inc., to American Physician Security Group, Inc. (APS), when, in fact, no bona fide sale had occurred," and, also, that "the objective of this conspiracy [was] that Swink and Company, Inc. would falsely represent the company's financial position by showing the commission from the sale of these bonds as an asset of Swink and Company, Inc. on a December 31, 1988, report required to be filed by the SEC." Count 1 alleged five overt acts in furtherance of the conspiracy, involving the purported sale of the bonds.

Count 16 charged Swink, Jr., with committing perjury while testifying as a witness in an SEC investigation, in violation of 18 U.S.C. 1621.

Count 17, a forfeiture count, was dropped before trial. The remaining 14 counts of the indictment charged only Swink, Sr., with various securities laws violations.

B. Prior to trial, Swink, Jr., moved to sever his case from his father's. Attached to the motion was an affidavit by his father which stated that, if called to testify in a separate trial, he would state that Swink, Jr., had entered into certain bond sales at the request of himself and Gary Granger, Swink & Company's financial and accounting principal; that Swink, Jr., "did not fully understand these transactions, but was assured by Mr. Granger that the transactions were proper and legal. My son also believed that the underwritings would be sold ultimately to the funds since the underwritings that he had become aware of had been sold to these customers"; and that his son

entered into three separate transactions with brokers/dealers selling the underwritings on what he understood to be a stand-by basis. In effect, he purchased a "put option" in conjunction with each underwriting, the exercise of which was conditioned on closing. My son candidly told the brokers/dealers that they would probably never have to purchase the bonds since he (my son) fully expected them to be sold to the fund customers. Both Swink & Company, Inc., and the brokers/dealers issued confirmations of these transactions. Income from the underwritings was accrued and, as a result, the firm's net capital was enhanced. My son was not aware of this accounting consequence and he had no involvement in the entry of these amounts on the books of the company or in the calculation of the resulting net capital.

The magistrate judge to whom the matter was referred granted the motion. The Assistant United States Attorney stated that "I think ... Mr. Swink, Sr.'s, testimony ... is needed by Mr. Junior. They have provided the substance of his testimony to the Court so that the Court can evaluate it. It obviously has exculpatory nature to it." The magistrate judge ruled:

[T]he significance of the testimony, given what seems to be the theory of Mr. Swink, Jr.'s, case, is such that that testimony would be necessary, and that severance, at least in my estimation, is necessary in this case.

Prior to trial, the government filed a motion in limine to bar Swink, Jr., from presenting his father's testimony. The motion stated that Swink, Sr.'s, affidavit "makes clear that Swink, Sr. will testify that he and Gary Granger requested that Swink, Jr. sell underwritings of the company. The affidavit, as clarified, makes clear that these sales were to be made so the income could be accrued" that Swink, Jr., had "clearly stat[ed]" in telephone conversations that "he is not selling the bonds to the purported buyer. For the reasons set forth in the memorandum attached hereto, the testimony of Swink, Sr. is not relevant since (1) Swink, Jr. knew that his actions were illegal and (2)

did not follow the purported advise of Granger and Swink, Sr."

The district court originally took the motion under advisement. After the government had put in its direct case and three defense witnesses had testified, the court granted the motion. The court stated that "a totality of the circumstances" had "persuaded (the court) that Mr. Swink, Jr. knew that his conduct was illegal."

The theory of the government's conspiracy case was that Swink, Jr., and his father had arranged that Swink, Jr., would effect a "sham" sale of nursing home bonds that the "purchaser" knew it would never have to accept, thereby generating commissions for Swink & Company that the latter could show as part of its capital in a year-end report it was required to file with the SEC.

The perjury charge was based upon sworn statements Swink, Jr., made during an SEC investigation of Swink & Company. The government attempted to prove the falsity of those statements by transcripts that the company regularly made of its telephone conversations. The details of the perjury count and the government's evidence are discussed in Part III below.

## II.

A major issue the jury had to resolve in adjudicating the conspiracy charge was whether Swink, Jr., had the necessary criminal intent. More specifically, did he know, or should he have known, that he was entering into an illegal arrangement by participating in an illegal scheme to file a false report to the SEC and, as a part of such scheme, effect a "sham" sale of bonds. The trial court charged the jury that an essential element of the crime of conspiracy is that "the defendant knowingly and willfully joined in the agreement or understanding", that "an act is done 'knowingly' if done voluntarily and intentionally, and not because of mistake or accident or other innocent reason," and that "if you find that Mr. Swink believed that the procedures he followed had been authorized and approved by the chief CPA of Swink & Company, Inc. or his father, Jim D. Swink, Sr., and if you find that Mr. Swink believed

that the procedures he followed were lawful, then it would be your duty to acquit him of the charges in Count I of the indictment."

The proposed testimony of Swink, Sr., that the district court excluded appeared highly relevant to that issue. In his affidavit supporting the motion for severance, Swink, Sr., stated that he would testify that Swink, Jr., "did not fully understand" the bond transactions he had entered into, but had been assured by Granger, Swink & Company's "financial and accounting principal" and a certified public accountant, that "the transactions were proper and legal"; that his "son also believed the underwritings would be sold ultimately to the funds since the underwritings that he had become aware of had been sold to these customers"; and that his "son was not aware" that the "[i]ncome from the underwritings was accrued and, as a result, the firm's net capital was enhanced."

If the jury had heard and credited that testimony, the jury might have concluded that Swink, Jr., had not knowingly participated in any illegal activity and that the government had not shown, as Count 1 of the indictment charged, that there had been "no bona fide sale" of the bonds.

■ In granting the motion to preclude Swink, Sr., from testifying, the district court concluded that "a totality of the circumstances" has persuaded it that Swink, Jr., "knew that his conduct was illegal." The determination whether Swink, Jr., "knew that his conduct was illegal," however, was for the jury, not for the court to make. The question was a key issue in the case that the parties hotly contested. It was improper for the district court to deny Swink, Jr., the right to call his father as a witness to give exculpatory testimony for him—a right that Swink, Jr., had under the Sixth Amendment, *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967)—on the basis of a factual determination that was for the jury to make.

■ The government contends, however, that Swink, Sr's, testimony was irrelevant because Swink, Sr., and Granger told Swink, Jr., to sell the bonds, whereas the evidence before the court when it excluded the testi-

mony "clearly establishe[d] that Defendant was fully aware that he had not sold these bonds." Once again, it was for the jury to determine whether Swink, Jr., had sold the bonds and, if not, was aware of that fact. Swink, Jr., contended that, in fact, he had sold them with the understanding that Swink & Company would repurchase them before the delivery date. Questions of credibility are for the jury, and it was for the jury to determine whether the proposed sale of the bonds was, as the government contended, a mere sham designed to create income for Swink & Company that it could then use to increase its capital account in the report to be filed with the SEC.

The two cases upon which the government relies—*United States v. Anderson,* 879 F.2d 369 (8th Cir.), *cert. denied,* 493 U.S. 982, 110 S.Ct. 515, 107 L.Ed.2d 516 (1989), and *United States v. Parker,* 839 F.2d 1473 (11th Cir.1988)—both involved the sufficiency of the evidence to support convictions, not the validity of the district court's exclusion of evidence the defendant wished to present.

Indeed, the district court's exclusion of this evidence at trial appears inconsistent with and contrary to the magistrate judge's prior granting of the severance. In taking that action, the magistrate judge stated that "given what seems to be the theory of Mr. Swink, Jr.'s, case," i.e., that, as his lawyer stated, he "believed that this was a bona fide sale," Swink, Sr.'s, "testimony would be necessary." It is difficult to understand how, if that testimony was "necessary" and, therefore, that a severance was "necessary", the testimony became irrelevant at trial.

The government's action to bar Swink, Jr., from introducing Swink, Sr.'s, testimony at trial as irrelevant, is itself inconsistent with the position it took in connection with the motion to sever. The government there conceded that Swink, Sr.'s, "testimony," which "obviously has exculpatory nature to it," "is needed by Mr. Junior." The government now contends that although Swink, Sr.'s, testimony was "necessary," that ruling was made in granting a severance and did not preclude the government "from arguing at trial that evidence was inadmissible as irrelevant." That argument is sheer sophistry. If

evidence is inadmissible because irrelevant, how could it possibly be necessary?

The government also argues that Swink, Sr.'s, testimony properly was excluded under Rule 615 of the Fed.Rules of Evid. because, although Swink, Sr., was specifically excluded from the courtroom, he was improperly in the courtroom during the testimony of the defense's expert witnesses. The government states it did not discover Swink, Sr.'s, courtroom presence until after the court granted the motion in limine, that it brought the matter to the court's attention the next morning and that the court declined to act on it because the court already had excluded Swink, Sr.'s, testimony. The government urges us to uphold the court's action because it "would also have been justified as a proper remedy under Rule 615."

■■■ As the government recognizes, however, "whether to exclude a witness' testimony is within the sound discretion of the court." *See United States v. Williams,* 604 F.2d 1102, 1115 (8th Cir.1979). We decline the government's suggestion that we affirm the exclusionary ruling on this alternative ground. We have no way of knowing how the district court would have ruled had it considered the Rule 615 contention. The court's sequestration order apparently did not cover expert witnesses. Moreover, since Swink, Sr.'s, testimony would have been that of an expert, the district court might have concluded that Swink, Sr.'s, courtroom presence during the testimony of other defense experts would not warrant excluding his testimony.

In sum, the district court's refusal to permit Swink, Jr., to present the exculpatory testimony of his father was prejudicial error that requires reversal of the conspiracy conviction under Count 1, and a remand for a new trial under that Count.

III.

A. The format of the perjury count (Count 16), was somewhat unusual. After reciting the purpose of the SEC investigation and the reason for interrogating Swink, Jr., Count 16 charged in subparagraph C that on a specified date and while under oath as a

witness in proceedings before the SEC, Swink, Jr., "willfully and contrary to his oath made a false, material declaration, as underlined below." There followed more than four pages of questions and answers, of which five sets of questions and answers were underlined. Count 16 concluded that "[t]he underlined testimony of JIMMY D. SWINK, JR., as set forth in C above was false and known to him to be false when made, said testimony being willfully given contrary to his oath in a matter material to the pending SEC investigation, in that JIMMY D. SWINK, JR., had knowledge of and understood the nature and amount of his father's transactions and had knowledge of specific problems of Swink and Company, Inc.'s capital position."

The allegedly false testimony that Swink, Jr., gave was as follows:

1. Q. Do you have any knowledge as to what levels this trading [for the firm] would have occurred at?

    A. What do you mean, dollar levels?

    Q Uh-huh.

    A No, ma'am.

    Q No idea at all?

    A No, ma'am. Again, I don't mean to seem ignorant, but I've done municipals all my life. I don't understand those things. They say ninety-eight and two, and—you know, I have no idea what that means, or two thirty-seconds or something.

2. Did your father confide in you as to the nature of his trading?

    A No, ma'am.

    Q Was that something—That nature and limits, was that something that he kept very confidential, even from you, his sons?

    A Yes, ma'am.

    *    *    *    *    *    *

    A But, did he sit down with me and say, "I have these," or "I sold these or that," no, absolutely not.

3. Q All right. Do you have any understanding as to what size the trades were?

    A No, ma'am.

4. Q I'm asking you do you know whether they were paired off.

    A No, ma'am, I do not. I don't know anything about his personal trading. I knew he did it. Okay? I mean, you have to understand our relationship. He did not tell me his personal business.

    Q All right. Would it be fair to say that he treated you the same way that he did any other employee of the firm in that regard?

    A Yeah, I would say that would be fair. Yeah. Maybe not any other, but, you know, as far as I'm concerned, I mean, I had no knowledge of the particular trades he was doing, or what type of securities or how many or when it was done, or anything of that nature. I would think that if he'd wanted me to be aware of that, he would have brought me in on it, and he didn't.

5. Q (Interposing) You weren't aware of any specific [capital] problems [of the firm]. Is that your testimony?

    A That's my testimony, yes, ma'am.

To prove the alleged falsity of the underlined statements of Swink, Jr., the government relied primarily on tape recordings of telephone conversations between Swink, Jr., his father and other personnel of Swink & Company, and one telephone conversation with his mother. The government also presented testimony to explain some of the taped telephone conversations.

■ B. To prove perjury, the government was required to show: (1) that Swink, Jr., testified under oath about certain material matters; (2) that the testimony was false; (3) that at the time, Swink, Jr., knew such testimony was false; and (4) that Swink, Jr., voluntarily and intentionally gave the testimony. Eighth Cir.Model Crim.Jury Instructions § 6.18.1621 (1989). *See United States v. Debrow,* 346 U.S. 374, 376, 74 S.Ct. 113, 114–15, 98 L.Ed. 92 (1953); *United States v. Edwards,* 443 F.2d 1286, 1290 (8th Cir.), *cert. denied,* 404 U.S. 944, 92 S.Ct. 295, 30 L.Ed.2d 259 (1971). In the present case, there is no question that Items 1 and 4 were satisfied. Items 2 and 3 coalesce, since the alleged falsity was Swink, Jr.'s denial of knowledge of his father's trading activities and the economic condition of Swink & Company. The government thus was required to

prove beyond a reasonable doubt that when Swink, Jr. made the underlined statements, he knew that they were false, i.e., that contrary to what he stated, he had knowledge of the specific matters regarding his father's trading and the condition of the company.

We have reviewed the transcripts of the recorded telephone conversations and the other evidence the government introduced. Even viewing this evidence most favorably to the government (*Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942)), it does not sustain the perjury conviction.

The government quotes the following conversation between Swink, Jr., and his father, in which it says they "talked at length about Mr. Swink, Sr.'s, trading.":

SWINK SR: Hey, son.

SWINK JR: Looking good, isn't it.

SWINK SR: Well, son, it's, uh, it's sure better than it was last night. It's up almost half a point, did you know that? LOU and them just didn't understand what we were talking about. I should have bought, I should have bought some last night.

SWINK JR: We should have done it, man, we should have done it. It didn't make any difference, but we didn't, so now we've got to figure out what we're going to do. Uh, are you going to be there today?

The government also refers to the following conversation between Swink, Jr., and Fred Brantley, a Swink & Company employee, in which Swink, Jr., allegedly "discussed the financial crisis which had just been averted because of a market change":

SWINK: Don't be talking like, you shit head.

BRANTLEY: Well, it looks like we got a possibility now.

SWINK: I mean, I told you, man.

BRANTLEY: Yeah.

SWINK: Told you, carry the faith, man.

BRANTLEY: I'll tell you what, I was looking pretty slim this morning.

SWINK: Just, just work with me on this.

BRANTLEY: (deleted)

SWINK: Just, I, I love this shit.

BRANTLEY: I know you do. I he-I heard you last night.

SWINK: Fires me up. See you, bye.

At trial, Brantley stated that the latter part of this conversation dealt with Swink, Sr.'s, trading. Brantley then testified about another conversation he had with Swink, Jr., about the latter's trading, which he stated also concerned the bond market.

Finally, the government stresses a conversation Swink, Jr., had with his mother, June Swink:

SWINK: .... I don't have a choice. I'm just, you know, at this point in time I'm living and dying by the damn long bonds.

JUNE: I know it.

■ This evidence, and the other evidence in the record the government cites, falls far short of sustaining the perjury charges of which Swink, Jr., was convicted. He was not charged with falsely denying knowledge of his father's bond trading generally or of the financial affairs of the company, but with specific items of that knowledge. The indictment alleged that in the SEC investigation that he falsely stated that he did not know "at what [dollar] levels this [municipal] bond trading [for the firm] would have occurred at"; that his father did not "confide in me as to the nature of his trading" but kept its "nature and limits" "very confidential" "even from you, his sons"; that he did not have "understanding as to what size the trades were"; that he had "no knowledge of the particular trades he was doing or what type of securities or how many or when it was done, or anything of that nature"; and that he was not "aware of any specific [capital] problems [of the firm]."

Swink, Sr.'s, statements that "it's sure better than it was last night. It's up almost half a point.... I should have bought some last night" and Brantley's statement that "I was looking pretty slim this morning" and Swink, Jr.'s, reply, "Just work with me on this," do not come even close to showing that Swink, Jr., lied when he stated that he did not know the dollar amounts of his firm's municipal bond trading, the "nature and limits" and "size" of his father's bond trading, or his

**859**

firm's "particular trades." Similarly, Swink, Jr.'s, statement to his mother, made during a lengthy conversation discussing whether he should go ahead with a contract to purchase a home, that "I'm living and dying by the damn long bonds" does not establish that Swink, Jr.'s, statements made to the SEC investigation regarding his knowledge of the specified details of his father's trading were false. The other transcripts, which we need not discuss, similarly contain equally vague and generalized statements and do not sustain the jury's finding that Swink, Jr., lied in the SEC investigation. Indeed, the major portion of the transcripts dealt with the state of and prospects for the market rather than with Swink, Sr.'s, trading activities or the capital position of Swink & Company.

■ To prove perjury, the government, of course, is not required to introduce specific direct evidence of the defendant's knowledge that his statements were false. *United States v. Roenigk,* 810 F.2d 809, 813 (8th Cir.1987) (citing *Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 137–38, 99 L.Ed. 150 (1954)). Something more was required, however, than the evidence introduced in this case to sustain the charge that Swink, Jr., knowingly had given false testimony in the SEC investigation.

> To sustain a conviction of perjury it must be shown by clear, convincing and direct evidence to a moral certainty and beyond a reasonable doubt that the defendant committed wilful and corrupt perjury, and the burden is on the government to prove the essential elements of the crime by substantial evidence excluding every other hypothesis than that of defendant's guilt. Probable or credible evidence is not enough.

*Blumenfield v. United States,* 306 F.2d 892, 897 (8th Cir.1962) (*quoting with approval Brown v. United States,* 245 F.2d 549, 556 (8th Cir.1957)).

The judgment of the district court convicting Swink, Jr., of conspiracy under Count I and of perjury under Count 16 is reversed, and Count 16 is dismissed with prejudice.

The case is remanded for a new trial on Count I.